# 24-1605

## United States Court of Appeals for the Second Circuit

PASTOR PAUL DOYLE, DBA Cornerstone Church, and CLAY CLARK,
DBA ReAwaken America,

*Plaintiffs-Appellees,*

v.

ATTORNEY GENERAL LETITIA JAMES,
in her individual and official capacity,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of New York

**BRIEF FOR APPELLANT**

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellant
28 Liberty Street
New York, New York 10005
(212) 416-8019

BARBARA D. UNDERWOOD
  *Solicitor General*
VICTOR PALADINO
  *Senior Assistant Solicitor General*
JOSEPH M. SPADOLA
  *Assistant Solicitor General*
    *of Counsel*

Dated: September 23, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................iii

PRELIMINARY STATEMENT .......................................................1

JURISDICTIONAL STATEMENT ...................................................2

ISSUES PRESENTED ....................................................................3

STATEMENT OF THE CASE .........................................................3

    A.   Factual Background ..............................................................3

        1.   The ReAwaken America Tour's Planned Event.................4

        2.   Attorney General James's Letter to the Tour's Organizers...................................................................6

        3.   Plaintiffs' Conclusory Allegations About the Purpose and Motivation Behind Attorney General James's Letter....................................................8

        4.   Plaintiffs' Conclusory Allegations About the Consequences of Attorney General James's Letter .........9

    B.   This Action and the Decision Below ......................................10

STANDARDS OF REVIEW ............................................................13

SUMMARY OF ARGUMENT .........................................................14

ARGUMENT

POINT I

    ATTORNEY GENERAL JAMES IS ENTITLED TO THE DISMISSAL OF PLAINTIFFS' FIRST AMENDMENT CLAIM BASED ON QUALIFIED IMMUNITY................................................................................16

**Page**

A.  Plaintiffs Have Not Plausibly Alleged That Attorney
General James Violated Their First Amendment Rights. .....17

1.  Attorney General James's Letter Cannot
Reasonably Be Construed to Convey a Threat to
Stifle Plaintiffs' Speech....................................................19

2.  Plaintiffs' Retaliation Claim Fails for Additional
Reasons. ...........................................................................23

B.  In Any Event, Attorney General James's Letter Did Not
Violate Clearly Established Law. ...........................................26

POINT II

ATTORNEY GENERAL JAMES IS ENTITLED TO THE DISMISSAL OF
PLAINTIFFS' DEFAMATION CLAIM BASED ON ABSOLUTE PRIVILEGE.......32

CONCLUSION ........................................................................40

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*Arcara v. Cloud Books, Inc.,*
478 U.S. 697 (1986)................................................................20

*Ashcroft v. al-Kidd,*
563 U.S. 731 (2011)................................................................17

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)....................................................3, 14, 25

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963).............................................................21, 28

*Boice v. Unisys Corp.,*
50 F.3d 1145 (2d Cir. 1995) ....................................................2

*Cheatum v. Wehle,*
5 N.Y.2d 585 (1959) ...............................................................37

*Clark v. McGee,*
49 N.Y.2d 613 (1980) ........................................................32-33

*Collick v. Hughes,*
699 F.3d 211 (2d Cir. 2012) ..................................................27

*Dixon v. von Blanckensee,*
994 F.3d 95 (2d Cir. 2021) ....................................................14

*Dorsett v. County of Nassau,*
732 F.3d 157 (2d Cir. 2013) .............................................24-25

*Ganek v. Leibowitz,*
874 F.3d 73 (2d Cir. 2017) ....................................................13

*Gautsche v. State,*
67 A.D.2d 167 (3d Dep't 1979).................................33-34, 36-37

*Gonzalez v. City of Schenectady,*
728 F.3d 149 (2d Cir. 2013) ..................................................27

| Cases | Page(s) |
|---|---|

*Grice v. McVeigh*,
873 F.3d 162 (2d Cir. 2017) ............................................................ 27

*Hammerhead Enterprises, Inc. v. Brezenoff*,
707 F.2d 33 (2d Cir. 1983) ........................................................ 18, 28

*Hill v. City of New York*,
45 F.3d 653 (2d Cir. 1995) ................................................................ 2

*Jeffery v. Fayetteville-Manlius Cent. Sch. Dist.*,
222 A.D.3d 1366 (4th Dep't 2023) .................................................. 35

*Jones v. Treubig*,
963 F.3d 214 (2d Cir. 2020) ............................................................ 27

*Kilcoin v. Wolansky*,
75 A.D.2d 1 (2d Dep't 1980) ............................................................ 39

*Lombard v. Stoke*,
18 N.Y.2d 394 (1966) ................................................................ 35, 38

*Millea v. Metro-N. R.R. Co.*,
658 F.3d 154 (2d Cir. 2011) ............................................................ 38

*Mullenix v. Luna*,
577 U.S. 7 (2015) ...................................................................... 27, 30

*Nat'l Rifle Ass'n of Am. v. Vullo*,
49 F.4th 700 (2d Cir. 2022) ............................................................ 18

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) .............................................. 18-19, 21-22, 29, 32

*Okwedy v. Molinari*,
333 F.3d 339 (2d Cir. 2003) ...................................................... 21, 28-29

*Ortiz v. Ciox Health LLC*,
961 F.3d 155 (2d Cir. 2020) ............................................................ 39

**Cases**                                                      **Page(s)**

*Park Knoll Assocs. v. Schmidt,*
59 N.Y.2d 205 (1983) ................................................ 32

*Pleasant Grove City, Utah v. Summum,*
555 U.S. 460 (2009)................................................... 24

*Rattner v. Netburn,*
930 F.2d 204 (2d Cir. 1991) ..................................... 29

*Schell v. Dowling,*
240 A.D.2d 721 (2d Dep't 1997) .......................... 35, 39

*Sheridan v. Crisona,*
14 N.Y.2d 108 (1964) ........................................ 32, 35-36

*Sindoni v. Bd. of Educ. of Skaneateles Cent. Sch. Dist.,*
217 A.D.3d 1363 (4th Dep't 2023) ................... 35, 37, 39

*Staehr v. Hartford Fin. Servs. Grp., Inc.,*
547 F.3d 406 (2d Cir. 2008) ............................... 14, 26

*Stanton v. Sims,*
134 S. Ct. 3 (2013)................................................... 27

*Stevens v. New York State Div. of Crim. Just. Servs.,*
40 N.Y.3d 505 (2023) .............................................. 34

*Suarez Corp. Indus. v. McGraw,*
202 F.3d 676 (4th Cir. 2000)................................... 18

*Tellier v. Fields,*
280 F.3d 69 (2d Cir. 2000) ...................................... 17

*VDARE Found. v. City of Colorado Springs,*
11 F.4th 1151 (10th Cir. 2021) ............................... 28

*Whiteside v. Hover-Davis, Inc.,*
995 F.3d 315 (2d Cir. 2021) .................................... 25

| Cases | Page(s) |
|---|---|

*X-Men Sec., Inc. v. Pataki,*
  196 F.3d 56 (2d Cir. 1999) ........................................................ 18

*Zieper v. Metzinger,*
  474 F.3d 60 (2d Cir. 2007) ....................................... 21, 28-29

## Constitutions

N.Y. Constitution
  art. V, § 1 ............................................................................... 33
  art. V, § 4 ............................................................................... 33

## Federal Statutes

28 U.S.C.
  § 1331 ....................................................................................... 2
  § 1367 ....................................................................................... 2

42 U.S.C.
  § 1983 ......................................................................... 1, 10, 16

## State Statutes

N.Y. Civil Rights Law
  § 40-c ....................................................................................... 7
  § 40-d ..................................................................................... 34
  § 79-n ............................................................................... 7, 33
  § 79-n(3) ............................................................................... 34

N.Y. Exec. Law
  § 63(12) ......................................................................... 34, 37

## Federal Rules

Federal Rule of Civil Procedure
  12(b)(6) ......................................................................... 11, 13

**Miscellaneous Authorities**                                    **Page(s)**

A.G. Cuomo Orders Mortgage Rescue Companies To Cease
    Fraudulent Practices (Jun. 23, 2010), https://ag.ny.gov/press-
    release/2010/attorney-general-cuomo-orders-mortgage-
    rescue-companies-cease-fraudulent ................................................... 29

A.G. Schneiderman Cracks Down On Price Gouging During
    Buffalo Blizzard (Nov. 24, 2014), https://ag.ny.gov/press-
    release/2014/ag-schneiderman-cracks-down-price-gouging-
    during-buffalo-blizzard-issues-consumer ........................................... 29

Ltr. From A.G. James to Madison Square Garden
    Entertainment Corp. (Jan. 24, 2023),
    https://ag.ny.gov/sites/default/files/2023-
    01/nys_oag_letter_to_madison_square_garden_entertainmen
    t_corp.pdf ........................................................................................ 29

Restatement (First) of Torts § 591 (1938) ................................................ 37

Rutkow, Lainie & Stephen P. Teret, *The Potential for State
    Attorneys General to Promote the Public's Health: Theory,
    Evidence, and Practice*, 30 St. Louis U. Pub. L. Rev. 267
    (2011) ............................................................................................... 29

U.S. Dep't of Justice, Attorney General William P. Barr's
    Statement on Riots and Domestic Terrorism (May 31, 2020),
    https://www.justice.gov/opa/pr/attorney-general-william-p-
    barrs-statement-riots-and-domestic-terrorism ................................. 30

WALL STREET JOURNAL, Attorney General Urges Calm (Nov. 21,
    2014), https://finance.yahoo.com/video/attorney-general-
    urges-calm-192702787.html .............................................................. 30

WANE.COM, Ohio Attorney General Warns Student Protesters
    in Masks Could Face Felony Charges Under Anti-KKK Law
    (May 9, 2024), https://www.wane.com/top-stories/ohio-
    attorney-general-warns-student-protesters-in-masks-could-
    face-felony-charges-under-anti-kkk-law/ .......................................... 31

## PRELIMINARY STATEMENT

This action arises from a letter that New York Attorney General Letitia James sent to the organizers of the ReAwaken America Tour, a self-described political tour, in advance of an event that the organizers held in August 2022. The letter expressed concern that racially motivated violence might occur at the event and instructed the event's organizer to take steps to ensure the event remained peaceful and complied with New York's civil rights laws. Plaintiffs—one of the event's organizers and the pastor of the church where the event was held—allege that the Attorney General, by her letter, infringed on their First Amendment rights in violation of 42 U.S.C. § 1983, and also defamed them in violation of New York law.

The Attorney General moved to dismiss plaintiffs' claims on various grounds, including that plaintiffs' First Amendment claim was barred by qualified immunity and plaintiffs' state-law defamation claim was barred by absolute privilege. The United States District Court for the Western District of New York (Sinatra, Jr., J.) denied the motion to dismiss, and this interlocutory appeal ensued. Because the district court erred in

rejecting the Attorney General's threshold qualified-immunity and absolute-privilege defenses, this Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction over plaintiffs' First Amendment claims under 28 U.S.C. § 1331 and exercised supplemental jurisdiction over their state-law defamation claim under 28 U.S.C. § 1367. The district court entered its order denying the Attorney General's motion to dismiss on May 13, 2024, and the Attorney General filed a timely notice of appeal on June 10, 2024. (JA 103-107.)

Under the collateral-order doctrine, this Court has jurisdiction to review an interlocutory appeal challenging the denial of a motion to dismiss based on qualified immunity where, as here, the denial turns on issues of law. *Hill v. City of New York*, 45 F.3d 653, 659-60 (2d Cir. 1995). The Court likewise has jurisdiction to review the denial of a motion to dismiss a defamation claim based on absolute privilege. *Boice v. Unisys Corp.*, 50 F.3d 1145, 1148-49 (2d Cir. 1995).

## ISSUES PRESENTED

1.    Is Attorney General James entitled to qualified immunity with respect to plaintiffs' claim that she violated plaintiffs' First Amendment rights by sending a letter to ReAwaken America Tour's organizers expressing concerns about the potential for violence or other unlawful conduct at the scheduled event, and instructing them to take steps to avoid such conduct?

2.    Does absolute privilege shield Attorney General James from plaintiffs' state-law defamation claim, when she made the allegedly defamatory statements in a letter advising plaintiffs to comply with the civil rights laws she enforces?

## STATEMENT OF THE CASE

### A.    Factual Background

Except where otherwise noted, the following allegations are drawn from plaintiffs' complaint and accepted as true for purposes of this appeal to the extent they are well pleaded and do not reflect conclusory allegations devoid of factual enhancement. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

3

### 1. The ReAwaken America Tour's Planned Event

The ReAwaken America Tour (the Tour) is a "conservative political movement/tour" that hosts events throughout the country. Speakers at the Tour's events include prominent Christians, Republicans, and conservative leaders. (JA 7-8 ¶ 9.) The Tour is organized by plaintiff Clay Clark, who operates a successful business podcast and consulting firm, and General Michael Flynn. (JA 7 ¶ 8; 8 ¶ 10.)

The Tour was scheduled to host an event in Rochester, New York, on August 12, 2022. Almost immediately after the event was scheduled, community leaders and politicians began to call for its cancellation. The president of the Monroe County Legislature, for example, issued a statement saying that the Tour had "left in its wake a trail of dangerous disinformation that can lead to increased bigotry, hate, and, at its most extreme, violence." (JA 9 ¶ 17.) Because of the "massive backlash and slanderous statements from government officials and politicians," the event was cancelled by the venue that had originally agreed to host it. (JA 10 ¶ 18.)

The Tour's organizers then reached out to plaintiff Paul Doyle, the senior pastor at Cornerstone Church, to see if his church would host the

event. (JA 7 ¶ 6; 10 ¶ 18.) Cornerstone Church is located in Batavia, New York, and has approximately 100 to 150 parishioners. The church provides charitable assistance and community programming to local neighborhoods and has consciously worked to build relationships with communities of color, including through aggressive assistance to the victims of a mass shooting in Buffalo, New York. (JA 7 ¶ 7.)

Pastor Doyle accepted the Tour's invitation to host the event at the Cornerstone Church. (JA 7-8 ¶ 9; 10 ¶ 19.) In planning the event, Doyle and Clark reached out to law enforcement and government officials to ensure that the event would be safe and that all local ordinances and rules would be followed. Doyle also met with multiple groups opposed to the event to better understand their concerns. Doyle was ultimately unable to assuage those concerns, however. After meeting with the groups, Doyle determined that the Tour was not being accurately portrayed in the media and by government officials. (JA 10 ¶ 19.)

Plaintiffs allege that they are law-abiding citizens and that neither they nor the Tour have a history of violence or unlawful behavior. (JA 9 ¶ 15.) Plaintiffs further allege that no Tour event has ever been associated with the "Great Replacement" theory discussed in the Attorney

General's letter described below, and that Pastor Doyle and Cornerstone Church likewise have never been associated with that theory. (JA 11 ¶ 25.)

### 2. Attorney General James's Letter to the Tour's Organizers

About a week before the Tour's planned event was scheduled to begin, Attorney General James sent the Tour's organizers a letter, which plaintiffs attached as an exhibit to their complaint. (JA 8 ¶ 10; 25-26.) The letter was addressed to the Tour's organizers, plaintiff Clark and General Flynn, in the care of Cornerstone Church. (JA 25.)

In the letter, the Attorney General explained that, as New York's chief law enforcement officer, she had "significant concerns" that the Tour's upcoming event "could spur extremist or racially motivated violence." She articulated two bases for this concern. First, the scheduled date of the event coincided with the fifth anniversary of the Unite the Right Rally in Charlottesville, Virginia, at which racially motivated violence had occurred. Second, the event's organizers and other featured speakers had previously made extremist statements, including regular allusions by some speakers to white-nationalist ideals connected to the

"Great Replacement Theory." The Attorney General described this theory as a conspiracy theory that warns of white genocide in efforts to replace "native-born" Americans with immigrants. This theory, she explained, is linked to several recent episodes of racially motivated violence, including a mass shooting that had occurred several months earlier in Buffalo, New York. Accordingly, "such rhetoric could contribute to violent or unlawful conduct" at the Tour's event. (JA. 25.)

The Attorney General advised the event's organizers that New York's civil rights laws prohibit racially motivated violence, harassment, or interference with another person in the exercise of their civil rights—including their right to peacefully protest—and that any person who violates this prohibition could be subject to a $5,000 penalty for each violation. The Attorney General explained that her office has a duty to protect New Yorkers from extremist and racially motivated violence and stands ready to investigate violations of the cited laws and, if necessary, to enforce them to the fullest extent available. (JA 25-26 (citing N.Y. Civil Rights Law §§ 79-n, 40-c; N.Y. Exec. Law § 63(12)).)

In closing, the Attorney General instructed the event's organizers "to take all necessary steps to ensure that the event complies fully" with

New York's civil rights laws and other state and federal laws, and she expressed appreciation in advance for the organizers' "cooperation in ensuring a peaceful and law-abiding event." (JA 26.)

### 3. Plaintiffs' Conclusory Allegations About the Purpose and Motivation Behind Attorney General James's Letter

Plaintiffs allege that the Attorney General's letter "can be considered nothing less than an attempt to intimidate and threaten the Plaintiffs into shutting down the event." (JA 8 ¶ 11; *see* JA 16 ¶ 54.) Plaintiffs further allege that the Attorney General "saw the ReAwaken America tour filled with her political rivals and wanted them out of the state" (JA 9 ¶ 16); that she sent the letter solely out of "political hatred" and "the intent of creating community vitriol and spite" towards plaintiffs (JA 13 ¶ 39; *see* JA 8 ¶ 12); and that plaintiffs' political and religious viewpoints, coupled with their race and color, were "the motivating factors" for the letter (JA 15 ¶ 50). Plaintiffs allege no facts to support these conclusory allegations.

### 4. Plaintiffs' Conclusory Allegations About the Consequences of Attorney General James's Letter

Plaintiffs claim that the Attorney General's letter "was reported on multiple media outlets" and "spread throughout the community of Rochester and the State of New York." (JA 14 ¶ 43; *see* JA 8 ¶ 13.) Although the complaint appears to suggest that the Attorney General published the letter (JA 6, 20 ¶ 72), it does not allege how or when she did so. Attorney General James submitted below an undisputed media report—of which this Court may take judicial notice, *see infra* at 14—establishing that plaintiff Clark himself posted the letter online. (JA 34; *see* JA 53.)

Plaintiffs allege further that the media reporting on the letter resulted in cancelled ticket sales (JA 14 ¶ 43); that Pastor Paul and Cornerstone Church "now have a smear against their names which has created a suspicious taint on the relationships they have worked diligently to develop" (JA 8 ¶ 13), including with communities of color (JA 14 ¶ 43); and that plaintiffs had to hire additional security to ensure the safety of the event's participants in case anyone acted out against them as a result of the Attorney General's allegedly "careless statements" (JA 13 ¶ 40).

9

Plaintiffs acknowledge that the event ultimately "went off without a single issue." (JA 9 ¶ 16.) Plaintiffs do not allege that the Attorney General's letter caused them or anyone else to curtail their expressive activity, or that the Attorney General took any legal action against them.

## B. This Action and the Decision Below

Plaintiffs brought this action against Attorney General James in the United States District Court for the Western District of New York. Their complaint alleges that the Attorney General's letter violated plaintiffs' right to free speech under the First Amendment, enforced under 42 U.S.C. § 1983, and that statements in the letter constituted defamation and defamation by implication under New York law.[1] For relief, plaintiffs seek an order requiring the Attorney General to "fully

---

[1] Plaintiffs also asserted state-law discrimination and negligence claims (JA 20-23), as well as a freedom-of-association claim under the First Amendment (JA 15). The district court dismissed those claims on the ground that plaintiffs did not address them in response to Attorney General James's motion to dismiss. (JA 100 n.10, 105, 79 n.5.) As a result, those claims are not before the Court on this interlocutory appeal. The district court likewise dismissed, on sovereign-immunity grounds, plaintiffs' First Amendment claim to the extent asserted against Attorney General James in her official capacity. (JA 80-81, 105.) The First Amendment claim presented in this appeal is thus asserted against Attorney General James solely in her individual capacity.

and publicly retract her letter," as well as nominal and punitive (but not actual) damages. (JA 23.)

The Attorney General moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (JA 28.) She argued, among other things, that the complaint failed to state a claim and, alternatively, that qualified immunity barred plaintiffs' First Amendment claim and that absolute privilege barred their state-law defamation claim. (ECF No. 13.)

Magistrate Judge H. Kenneth Schroeder, Jr. issued a report and recommendation recommending that the court deny the Attorney General's motion to dismiss the First Amendment and state-law defamation claims at issue in this appeal. (JA 60-102.) The Attorney General objected to the report and recommendation on the grounds discussed in the argument section below (ECF No. 23), but the district court summarily adopted the recommendation without further analysis. (JA 103-105.)

In addressing plaintiffs' First Amendment claim, the court analyzed the four factors identified by this Court (and discussed *infra* at 18-19) to assess whether government speech constitutes impermissible

coercion. The court found that (1) the tone and word choice of the Attorney General's letter were "heavy-handed" and "ominous"; (2) she had undisputed regulatory authority over plaintiffs, in that she could bring legal action against them; (3) plaintiffs adequately pled that they perceived the letter as conveying a threat to shut down their event; and (4) the letter referred to adverse consequences, by "raising the specter of prosecution." (JA 76-79.) The court did not address the Attorney General's argument that any regulatory authority or adverse consequences she invoked in the letter related to unlawful conduct, not protected speech. (ECF Nos. 13-1 at 26-29; 18 at 7-10.)

The court also held that plaintiffs satisfied the elements of a First Amendment retaliation claim. Specifically, the court relied on the conclusory allegations described *supra* at 8-10 to conclude that plaintiffs plausibly alleged that, in sending her letter, the Attorney General was motivated by plaintiffs' exercise of their First Amendment rights (JA 70-71) and that the letter caused them a concrete injury in the form of reputational harm. (JA 68, 72.)

The court also held that the Attorney General was not entitled to the dismissal of plaintiffs' First Amendment claim based on qualified

immunity. (JA 81-85.) The court reasoned that it has long been clearly established that implied threats to employ coercive state power to stifle protected speech violate the First Amendment (JA 82-83) and that this Court's caselaw had clearly traced the line between permissible attempts to persuade and impermissible attempts to coerce. (JA 83-85.)

In addressing plaintiffs' state-law defamation claim, the court held that plaintiffs adequately pleaded the elements of both defamation and defamation by implication and that the Attorney General was not entitled to the dismissal of those claims based on absolute privilege. (JA 86-100.) In finding the absolute privilege inapplicable, the court reasoned that the Attorney General was not acting within the scope of her official duties in sending her letter because she had not initiated any official investigation, prosecution, or other governmental process against plaintiffs. (JA 86-91.)

## STANDARDS OF REVIEW

This Court reviews the denial of a motion to dismiss de novo. *Ganek v. Leibowitz*, 874 F.3d 73, 80 (2d Cir. 2017). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain factual allegations that, accepted as true, are sufficient to state a claim that is plausible on its

13

face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Conclusory assertions devoid of factual enhancement do not suffice. *Id.* In reviewing a motion to dismiss, the Court may consider, in addition to the complaint, any written instrument attached to it as an exhibit. *Dixon v. von Blanckensee*, 994 F.3d 95, 101-02 (2d Cir. 2021). The Court may also consider matters of which a court may take judicial notice, including media reports introduced to show the manner in which certain statements were publicized, as distinct from the truth of the statements. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

## SUMMARY OF ARGUMENT

I.  The district court erred in declining to dismiss plaintiffs' First Amendment claim based on qualified immunity. Attorney General James is entitled to qualified immunity as a matter of law unless plaintiffs plausibly allege that she violated their constitutional rights and those rights were clearly established. Neither requirement is satisfied here.

A.  Plaintiffs have not plausibly alleged that the letter Attorney General James sent in advance of their planned event constituted either retaliation or censorship in violation of the First Amendment. Both claims require a showing that the letter can reasonably be understood as

14

conveying a threat of adverse government action to stifle or punish plaintiffs' speech. No such showing is possible here because the letter focuses exclusively on deterring racially motivated violence and other discriminatory *conduct*, not on precluding plaintiffs or others from expressing their views. Unlike in the Supreme Court's recent *Vullo* decision and other cases involving coercive threats to stifle speech, plaintiffs allege no facts suggesting that the Attorney General conditioned the exercise of her regulatory authority on plaintiffs' willingness or unwillingness to suppress disfavored speech.

Plaintiffs' retaliation claim fails for the additional reason that plaintiffs do not plausibly allege that (1) the Attorney General's letter was motivated by retaliatory animus toward plaintiffs' political or religious views or (2) the letter caused them any concrete injury.

B. Even if plaintiffs plausibly alleged a violation of their First Amendment rights, the Attorney General would be entitled to qualified immunity because the scope of those rights was not clearly established. No relevant precedent suggests, much less clearly establishes, that a law enforcement official violates the First Amendment by sending a letter that expresses concern about the potential for violent and discriminatory

15

conduct at a public event and instructs the event's organizers to take steps to avoid such conduct.

II.   The district court likewise erred in declining to dismiss plaintiffs' state-law defamation claim based on absolute privilege. Under New York law, high-level executive officials like the Attorney General are afforded absolute immunity from defamation suits for statements that relate to their duties and are made during the performance of those duties. Contrary to the district court's conclusion, the Attorney General's duties are not confined to formal investigations or enforcement actions, and readily encompass the issuance of a letter advising individuals to comply with the civil rights laws she enforces.

## ARGUMENT

## POINT I

### ATTORNEY GENERAL JAMES IS ENTITLED TO THE DISMISSAL OF PLAINTIFFS' FIRST AMENDMENT CLAIM BASED ON QUALIFIED IMMUNITY

The district court erred in declining to dismiss plaintiffs' First Amendment claim based on qualified immunity. Qualified immunity will defeat a section 1983 claim on a motion to dismiss unless a plaintiff pleads facts showing that the official violated a statutory or constitu-

tional right and that the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Both requirements present questions of law that are properly presented on an interlocutory appeal. *Tellier v. Fields*, 280 F.3d 69, 78-79 (2d Cir. 2000). Plaintiffs' allegations satisfy neither requirement here.

## A.  Plaintiffs Have Not Plausibly Alleged That Attorney General James Violated Their First Amendment Rights.

Plaintiffs' First Amendment claim is based exclusively on the letter that Attorney General James sent to the Tour's organizers expressing concerns about the potential for racially motivated violence and other unlawful conduct at the Tour's upcoming event. While it is unclear whether plaintiffs assert a First Amendment claim for censorship as well as retaliation (*see* ECF 16 at 8-12), the Attorney General's letter does not plausibly support either claim.

When, as here, the adverse action underlying a First Amendment claim takes the form of a government official's speech, both retaliation and censorship claims require a showing that the speech, "viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech."

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191 (2024) (setting out this standard in addressing both retaliation and censorship claims, after noting that this Court had analyzed both claims together)[2]; *see Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) (applying same standard to censorship claim); *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 70-72 (2d Cir. 1999) (applying same standard to retaliation claim); *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687-88 (4th Cir. 2000) (same, collecting cases).

Before the Supreme Court's recent decision in *Vullo*, this Court had applied various factors in assessing whether a government official's speech constituted an impermissible threat of adverse government action to stifle speech. Those factors included word choice and tone, the existence of regulatory authority, whether the speech was perceived as a threat, and whether the speech referred to adverse consequences. *Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 715 (2d Cir. 2022), *vacated and remanded*, 602 U.S. 175 (2024).

---

[2] To the extent retaliation claims require a separate analysis in this context, as Justice Jackson suggested in her concurrence in *Vullo*, 602 U.S. at 199-204, plaintiffs' retaliation claim fails for the additional reasons discussed *infra* at 23-25.

18

In reversing this Court's decision in *Vullo*, the Supreme Court explained that such factors can serve as a "useful, though nonexhaustive, guide." 602 U.S. at 191. In its own analysis, the Supreme Court considered similar factors, such as the nature of the defendant official's regulatory authority, what the official said to the regulated entities she allegedly coerced, and how the entities reacted to her statements. *Id.* at 191-94. The Court emphasized, however, that in conducting this analysis, courts should not consider the factors in isolation from one another or lose sight of the ultimate question they are meant to answer: whether the official's challenged conduct, viewed objectively and in context, conveys a threat of adverse government action to stifle speech. *Id.* at 195; *see id.* at 199 (Gorsuch, J., concurring). Applying this framework here undermines any plausible inference that the Attorney General's letter conveyed such a threat.

## 1. Attorney General James's Letter Cannot Reasonably Be Construed to Convey a Threat to Stifle Plaintiffs' Speech.

As a threshold matter, the only support plaintiffs offer for their claim that the Attorney General's letter constituted impermissible coercion is the text of the letter itself. Nothing in that text, however, plausibly

19

suggests a threat to stifle speech. On the contrary, every sentence in the letter focuses on preventing racially motivated violence and other discriminatory *conduct*, which the First Amendment does not protect, *see, e.g.*, *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986). Specifically, the letter expresses concern that racially motivated violence might occur at the Tour's upcoming event, based on several recent episodes of such violence linked to white-nationalist ideals; informs the event's organizers that New York's civil rights laws prohibit and impose monetary penalties for "racially motivated violence, harassment, or interference with another person in the exercise of their civil rights"; advises that the Attorney General's Office is authorized and stands ready to investigate any violations of those laws; and instructs the event's organizers to take all necessary steps to ensure the event remains peaceful and complies with the law. (JA 25-26.) At every turn, the letter conveys a desire to prevent unlawful conduct rather than to stifle speech.

The absence of any discernable request (let alone threat) to suppress disfavored speech distinguishes Attorney General James's letter from the government speech found coercive in other cases, including the Supreme Court's recent decision in *Vullo*. The government

officials in those cases, unlike here, did not just invoke their regulatory authority and the specter of adverse consequences; they did so in connection with an unequivocal request to suppress disfavored expression. In *Vullo*, New York's insurance regulator was alleged to have told insurance executives to sever ties with gun-advocacy groups, or else they would face enforcement actions for unrelated insurance-law infractions. 602 U.S. at 191-193. In *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), a state commission told a book distributor to remove certain objectionable publications from circulation, or else the distributor would face referral for prosecution under the state's obscenity laws. In *Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007), an FBI agent told the author of a controversial film to remove the film from the internet, or else the FBI would continue looking into the matter. And in *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003), a borough president told a religious group that their billboards were "not welcome in our Borough," and insinuated that a refusal to remove the billboards could prompt adverse action by the president's legal counsel and anti-bias task force.

In each of these cases, the government overtly demanded the suppression of speech and backed that demand with a threat of sanctions.

21

Here, in contrast, Attorney General James never demanded, explicitly or implicitly, that plaintiffs suppress their or anyone else's speech; nor did she threaten adverse action if they refused to do so. Her only request was for plaintiffs to take steps to ensure that their planned event remained peaceful and complied with New York's antidiscrimination laws.

To be sure, the Attorney General's request to avoid violent and discriminatory conduct was based on her judgment that such conduct was rendered more likely by the white-nationalist rhetoric anticipated at the event—rhetoric that had contributed to several recent episodes of racially motivated violence. (JA 25.) But the Constitution does not preclude a law enforcement official from forming or acting on such a judgment. While the First Amendment prohibits government officials from using state power to "punish or suppress disfavored expression," *Vullo*, 602 U.S. at 176, it does not prohibit them from addressing unlawful conduct associated with or caused by that expression.

That the Attorney General's letter conveyed only a request to avoid unlawful conduct—and not to curtail speech—is reflected in plaintiffs' reaction to the letter. Unlike in the cases discussed above, where the government's threats succeeded in suppressing disfavored speech,

22

plaintiffs do not allege that the letter caused them or anyone else to curtail their expressive activity. On the contrary, plaintiffs acknowledge that their event ultimately "went off without a single issue." (JA 9 ¶ 16.) By their own account, the only action that they took in response to the letter was to hire additional security (JA 13 ¶ 40), confirming that they viewed the letter as calling for the prevention of violence rather than the suppression of speech.

In sum, nothing about the Attorney General's letter—including its words and tone, its invocation of regulatory authority and adverse consequences, or plaintiffs' reaction—can reasonably be viewed as a threat to stifle speech.

### 2. Plaintiffs' Retaliation Claim Fails for Additional Reasons.

Because the Attorney General's letter cannot reasonably be construed to convey a coercive threat to stifle speech, plaintiffs' First Amendment retaliation and censorship claims both fail as a matter of law. As explained *supra* at 17-18, when a retaliation claim alleges that the government took no adverse action against the plaintiffs other than itself engaging in speech, the plaintiffs must show that the governmental

speech was coercive, that is, that it threatened to suppress the plaintiffs' speech. There is no need to independently analyze whether the government spoke with a retaliatory motive or caused plaintiffs injury. This is so because, absent coercion, the government is entitled "to favor and disfavor points of view." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467-68 (2009) (quotation marks omitted).

Should the Court nonetheless conclude that plaintiffs' retaliation claim requires an analysis of the elements required to establish a non-speech-based retaliation claim, plaintiffs' claim fails under that analysis as well. Specifically, plaintiffs do not plausibly allege that (1) the Attorney General's letter was motivated or substantially caused by plaintiffs' exercise of their First Amendment rights or (2) the letter chilled their speech or caused them some other concrete harm. *See Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (setting out elements of First Amendment retaliation claim).

As to the motivation for the letter, the complaint offers nothing more than unsupported legal conclusions: that the Attorney General was motivated by "political hatred" (JA 13 ¶ 39), a desire to rid the state of her political rivals (JA 9 ¶ 16), and animus toward plaintiffs' political and

24

religious views (JA 15 ¶ 50). Plaintiffs do not allege any facts to support these conclusory assertions; consequently, they fail to raise a plausible inference of retaliatory intent. *See Iqbal*, 556 U.S. at 678, 686-87; *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021). Nor can such an inference be drawn from the letter itself. The only intent reflected in the letter is to deter violent and discriminatory conduct, not to punish plaintiffs for their speech.

Equally conclusory are plaintiffs' allegations concerning the injury the Attorney General allegedly caused them. Plaintiffs do not allege that her letter chilled their speech in any way. Nor do they allege facts plausibly suggesting that she caused them "some other concrete harm." *Dorsett*, 732 F.3d at 160. While the complaint contains vague allegations about reputational harm and cancelled ticket sales (JA 14 ¶¶ 43, 45), plaintiffs allege no facts linking those harms to the allegedly defamatory content of the Attorney General's letter. On the contrary, the complaint acknowledges that, before the Attorney General was even involved, there was a "massive backlash" against the Tour's planned event and that other community leaders, politicians, and media outlets had made slanderous or false statements about the event. (JA 10 ¶¶ 18-19.) The

complaint offers no reason to conclude that the reputational or other harms they allegedly suffered were caused by the Attorney General's letter rather than this broader public backlash.

Additionally, plaintiffs have not adequately alleged that the Attorney General was responsible for the publication of her letter. While the complaint vaguely alleges that she "publish[ed] an official letter" (JA 20 ¶ 72), it does not allege when or how she did so. And an undisputed media report—of which this Court may take judicial notice, *see Staehr*, 547 F.3d at 425—establishes that plaintiff Clark posted the letter online two days before the planned event. (JA 33-34; *see* JA 53.) Any harm arising from the letter's publication is thus more plausibly attributed to Clark than to Attorney General James.

## B. In Any Event, Attorney General James's Letter Did Not Violate Clearly Established Law.

Even if plaintiffs plausibly alleged a violation of their First Amendment rights, Attorney General James would be entitled to qualified immunity because the scope of those rights was not clearly established.

The precedents of the Supreme Court and this Court determine whether a constitutional right is "clearly established." *Gonzalez v. City of Schenectady,* 728 F.3d 149, 161 (2d Cir. 2013). An official's conduct does not violate clearly established law unless relevant precedents in existence at the time of the conduct had placed the constitutional question "beyond debate." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (quotation marks omitted). In other words, government officials "are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Collick v. Hughes*, 699 F.3d 211, 221 (2d Cir. 2012) (quotation marks omitted).

The Supreme Court has repeatedly stressed that clearly established law must be "defined with specificity." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020). The inquiry does not turn on any "broad general proposition" but rather on "the specific context of the case." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quotation marks omitted). Rights are not clearly established, therefore, unless the Court can identify a case where an official acting under similar circumstances was held to have acted unconstitutionally. *Grice v. McVeigh,* 873 F.3d 162, 166 (2d Cir. 2017).

27

There is no such case here. Many cases have established the general principle that government officials cannot threaten adverse consequences to stifle speech, *see, e.g.*, *Bantam Books*, 372 U.S. at 66-72; *Zieper*, 474 F.3d at 65-71; *Okwedy*, 333 F.3d at 342-44—a principle the Supreme Court recently reaffirmed in *Vullo*. But there are no cases applying that general principle in a context where a law enforcement official raised concerns about unlawful conduct at an upcoming public event and instructed the event's organizers to ensure that the event complied with the law.

All the cases in which either this Court or the Supreme Court had even considered whether government speech constituted impermissible coercion involved a government official unequivocally requesting that a private party suppress some form of protected expression. The question presented in those cases was whether the officials supported their request with arguments (i.e., persuasion) or threats of adverse government action (i.e., coercion). Some cases found persuasion, *Hammerhead Enters.*, 707 F.2d at 38-40; *VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1161-1163 (10th Cir. 2021); others found coercion, *Bantam Books*, 372 U.S. at 66-72; *Zieper*, 474 F.3d at 65-71; *Okwedy*, 333 F.3d at

342-44; *Rattner v. Netburn*, 930 F.2d 204, 208-10 (2d Cir. 1991); *accord Vullo*, 602 U.S. at 191-93.

This line of cases has no application here. Attorney General James did not demand, directly or indirectly, that plaintiffs cancel their event or refrain from any expressive activity—much less did she threaten adverse consequences if they refused. Instead, she asked them to take steps to ensure that the event remained peaceful and complied with New York's antidiscrimination laws. State Attorneys General routinely issue similar warnings to follow the law to many different individuals, organizations, and businesses;[3] indeed, using the bully pulpit in this manner to promote compliance with the law is a critical part of the Attorney General's role. *See, e.g.*, Lainie Rutkow & Stephen P. Teret, *The*

---

[3] To cite a few examples, the New York Attorney General has, across administrations, sent letters raising concerns about an event venue's use of facial-recognition software, *see* Ltr. From A.G. James to Madison Square Garden Entertainment Corp. (Jan. 24, 2023); instructing businesses not to price-gouge during a snow emergency, *see* A.G. Schneiderman Cracks Down On Price Gouging During Buffalo Blizzard (Nov. 24, 2014); and ordering mortgage-rescue companies to cease fraudulent practices against homeowners, *see* A.G. Cuomo Orders Mortgage Rescue Companies To Cease Fraudulent Practices (Jun. 23, 2010). (For authorities available online, full URLs appear in the Table of Authorities. All URLs were last visited on September 20, 2024.)

*Potential for State Attorneys General to Promote the Public's Health: Theory, Evidence, and Practice*, 30 St. Louis U. Pub. L. Rev. 267, 276-77 (2011). A reasonable official in the Attorney General's shoes would have no reason to think that issuing such a warning could be deemed an unconstitutional attempt to stifle protected speech.

The dearth of caselaw addressing the "specific context" of this case confirms the reasonableness of the Attorney General's warning here. *Mullenix*, 577 U.S. at 12. When there is a public gathering on a highly controversial and divisive issue—as there undisputedly was here—the law is far from clear that the First Amendment prohibits law enforcement officials from urging organizers and attendees to avoid confrontation and respect the rights of others. Such admonitions do not suppress speech but protect it, by ensuring that all sides of the debate can speak freely, without fear of violence or intimidation. Attorneys General of all political stripes have issued similar messages to safeguard the public square during times of heightened tension. *See, e.g.*, WALL STREET JOURNAL, Attorney General Urges Calm (Nov. 21, 2014) (U.S. Attorney General Eric Holder urging protesters to be peaceful ahead of grand-jury decision in divisive case); U.S. Dep't of Justice, Attorney General William P.

Barr's Statement on Riots and Domestic Terrorism (May 31, 2020) (U.S. Attorney General William Barr calling for deployment of law enforcement to ensure that "peaceful and legitimate protests" are not "hijacked by violent radical elements"); WANE.COM, Ohio Attorney General Warns Student Protesters in Masks Could Face Felony Charges Under Anti-KKK Law (May 9, 2024) (Ohio Attorney General warning students who wear masks during pro-Palestinian protests that they could be prosecuted under the state's anti-KKK law). Even if this widespread practice did raise First Amendment concerns, no case—much less a Second Circuit or Supreme Court case—clearly establishes the parameters of permissible Attorney General communications in this context. Given this dearth of settled law, Attorney General James is entitled to qualified immunity for taking reasonable steps to encourage "a peaceful and law-abiding event." (JA 26.)

Finally, while this Court is currently reviewing the issue of qualified immunity in the *Vullo* case, following the Supreme Court's remand (*see* 2d Cir. No. 21-636), a holding that the official's alleged conduct in that case violated clearly established law would have no bearing on the qualified-immunity analysis presented here. For all the

reasons explained above, this case, unlike *Vullo*, lacks anything approaching an express demand to suppress speech coupled with an ultimatum in the form of "comply or I'll prosecute" or "comply and I'll look the other way." *Vullo*, 602 U.S. at 193 (quotation marks omitted).

## POINT II

### ATTORNEY GENERAL JAMES IS ENTITLED TO THE DISMISSAL OF PLAINTIFFS' DEFAMATION CLAIM BASED ON ABSOLUTE PRIVILEGE

Under New York law, the principal executives of State and local governments are afforded an absolute privilege that bars defamation suits for statements related to their official duties and made during the performance of those duties. *Clark v. McGee*, 49 N.Y.2d 613, 619 (1980); *see also Sheridan v. Crisona*, 14 N.Y.2d 108, 112 (1964) (absolute privilege covers statements made "in the discharge of official duty"). The policy underlying the privilege ensures that officials may speak freely in discharging their public duties, insulated from harassment and fear of financial hazard. *Park Knoll Assocs. v. Schmidt*, 59 N.Y.2d 205, 209-10 (1983). The privilege applies regardless of the public official's motive in making the challenged statements. *Id.*

There is no dispute here that Attorney General James, as the head of New York's Department of Law, *see* N.Y. Const., art. V, §§ 1, 4, is a principal state executive entitled to invoke the absolute privilege. *See Gautsche v. State*, 67 A.D.2d 167, 169 (3d Dep't 1979). The only question is whether the statements in the Attorney General's letter were related to her official duties and made during the performance of those duties. *See Clark*, 49 N.Y.2d at 619. The district court erred in concluding that they were not.

Attorney General James sent the letter on her official letterhead and made clear in the first sentence that she was writing in her official capacity as "New York's top law enforcement officer." (JA 25.) After raising concerns about the potential for racially motivated violence and other discriminatory conduct at the Tour's upcoming event, the Attorney General explained that she had the authority to investigate such conduct under New York Civil Rights Law § 79-n and Executive Law § 63(12). And consistent with that authority, she instructed plaintiffs to take steps to ensure that the event complied with those laws. All of these statements fall squarely within the scope of the Attorney General's official duties to enforce New York's antidiscrimination laws.

Contrary to the district court's conclusion (JA 89-90), the Attorney General did not need to initiate a formal investigation, prosecution, or other similar process against plaintiffs to speak within the scope of her official duties. Like all government officials in New York, the Attorney General's authority includes not only those powers expressly conferred by statute—like conducting investigations and initiating court proceedings to enforce antidiscrimination laws, *see* N.Y. Civil Rights Law §§ 79-n(3), 40-d; N.Y. Exec. Law § 63(12)—but any powers required by necessary implication, *Stevens v. New York State Div. of Crim. Just. Servs.*, 40 N.Y.3d 505, 524 (2023). And the power to enforce New York's antidiscrimination laws necessarily implies the power to identify situations in which those laws might be violated and to instruct relevant individuals to comply with those laws. *See Gautsche*, 67 A.D.2d at 170 (Attorney General's power to conduct fraud investigations includes power to inform public about facts underlying fraud investigations).

Many cases confirm that public officials need not initiate a formal governmental process to speak within the scope of their duties. For example, New York courts have found the privilege applicable to the following officials who had initiated no such process:

- a college president who issued a statement responding to publicly reported allegations of anti-Catholic bias at the college, *Lombard v. Stoke*, 18 N.Y.2d 394 (1966);

- a city borough president who allowed the press to review a report he had prepared characterizing the plaintiff appraiser as ignorant and incompetent, *Sheridan*, 14 N.Y.2d 108;

- a school superintendent who circulated a letter to the local community implicitly accusing the plaintiff football coach of not following proper Covid-19 precautions, *Sindoni v. Bd. of Educ. of Skaneateles Cent. Sch. Dist.*, 217 A.D.3d 1363 (4th Dep't 2023);

- school officials who disclosed that a community member had purchased a firearm for his son, which the officials believed to pose a safety issue for the school, *Jeffery v. Fayetteville-Manlius Cent. Sch. Dist.*, 222 A.D.3d 1366 (4th Dep't 2023); and

- a county health commissioner who commented publicly on an official's handling of a tuberculosis incident that had become a matter of public controversy, *Schell v. Dowling*, 240 A.D.2d 721 (2d Dep't 1997).

In none of these cases did the availability of the absolute privilege turn on the defendant officials' initiation of a formal governmental process or on an express statutory duty to issue the challenged statements. Rather, the statements were deemed to fall within the officials' duties because, like the statements in Attorney General James's letter, they were "made in the course of the performance of some function connected with the office" they occupied. *Sheridan*, 14 N.Y.2d at 113.

The Third Department's decision in *Gautsche* is not to the contrary. There, then New York Attorney General Louis Lefkowitz was granted absolute immunity for allegedly defamatory statements made during a fraud investigation, including statements made in a press release. 67 A.D.2d at 169. While the court relied on Attorney General Lefkowitz's initiation of a fraud investigation and enforcement proceeding to conclude that the Attorney General was acting within the scope of his official duties, the court did not hold or suggest that this type of formal process is *required* for the Attorney General to invoke the absolute privilege. On the contrary, the court recognized that the Attorney General's statutory duty to investigate and prosecute fraud necessarily encompasses, as a matter of public policy, informing the public about

36

illegal activities uncovered during an investigation, *id.* at 170, even though this power is not expressly conferred by statute, *id.* at 169-70 (discussing N.Y. Exec. Law § 63(12)).

Both the district court and plaintiffs below cited *Cheatum v. Wehle*, 5 N.Y.2d 585, 592 (1959), for the proposition that an executive official's statements are privileged so long as they bear "some relation to the executive proceeding in which he is acting." (JA 86.) But *Cheatum* never suggested that the executive proceeding in question must be a *formal* proceeding like a criminal investigation or prosecution; on the contrary, the Restatement of Torts provision from which *Cheatum* derives this proposition makes clear that the privilege extends to any executive action that is "incidental to the performance of the duties of the office," Restatement (First) of Torts § 591, cmt. a (1938)—a standard that accords with that applied by the above cases.

In addition to the subject matter of a public official's statements, New York courts applying the absolute privilege often assess the appropriateness of the "forum" in which the official has made the statements, in particular where the forum involves a public statement. *E.g.*, *Sindoni*, 217 A.D.3d at 1366. Here, neither plaintiffs nor the district court argued

below that the forum of Attorney General James's statements precluded application of the absolute privilege. (*See* JA 86-91; ECF No. 16 at 12-14.) Any such argument is therefore unpreserved for this Court's review. *See Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 163 (2d Cir. 2011).

The argument lacks merit anyway. Other than a vague and conclusory allegation that the Attorney General "publish[ed] an official letter" (JA 20 ¶ 72), the complaint contains no allegations concerning how or when she made her letter public. The complaint thus does not support a plausible inference that her method of communication was "totally unwarranted." *Lombardo*, 18 N.Y.2d at 401. Indeed, even assuming that the Attorney General did make her letter public, plaintiffs' own allegations establish that she was justified in doing so. By plaintiffs' own account (JA 10 ¶ 18), their planned event had generated a "massive backlash" based on concerns that the Tour's speakers were disseminating "dangerous disinformation" that could lead to "increased bigotry, hate, and, at its most extreme, violence." (JA 9 ¶ 17.) Given this widespread concern, the Attorney General was well within her rights to issue a public statement to "assure the public that steps were being taken" to address the possibility of hate-based violence and other discriminatory conduct.

*Kilcoin v. Wolansky*, 75 A.D.2d 1, 10 (2d Dep't 1980) (public comment warranted to address controversy concerning patient abuse at local mental-health facility); *see Sindoni*, 217 A.D.3d at 1366 (same as to controversy surrounding decision not to reappoint football coach); *Schell*, 240 A.D.2d at 722 (same as to controversy concerning official's handling of tuberculosis incident).

For all these reasons, the district court erred in holding that the statements in Attorney General James's letter did not fall within the scope of the absolute privilege. If this Court has any doubt about how New York courts would apply the privilege in this context, the Court should consider certifying the question to the New York Court of Appeals. *See Ortiz v. Ciox Health LLC*, 961 F.3d 155, 158 (2d Cir. 2020) (describing standard for certification).

## CONCLUSION

The Court should reverse the district court's order denying Attorney General James's motion to dismiss based on qualified immunity and absolute privilege.

Dated:  New York, New York
       September 23, 2024

                              Respectfully submitted,

                              LETITIA JAMES
                                *Attorney General*
                                *State of New York*
                              Attorney for Appellant


                      By:   */s/ Joseph M. Spadola*
                              JOSEPH M. SPADOLA
BARBARA D. UNDERWOOD          Assistant Solicitor General
  *Solicitor General*
VICTOR G. PALADINO            28 Liberty Street
  *Senior Assistant Solicitor General*   New York, New York 10005
JOSEPH M. SPADOLA            (212) 416-8019
  *Assistant Solicitor General*
       *of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Joseph M. Spadola, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 7,532 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

_/s/  Joseph M. Spadola_